MARION F. EDWARDS, Judge.
Defendants/Appellants seek reversal of a jury verdict which awarded plaintiff $150,000.00 in general damages and $365,000.00 for mental anguish, arising from an incident in which defendant intentionally shot the plaintiff. For the following reasons, the jury’s verdict is affirmed.
FACTS AND PROCEDURAL HISTORY
On May 17, 1999, Walter Baudier (“Bau-dier”) was on the premises of the Metairie Country Club in Jefferson Parish for the purpose of playing a round of golf with an associate. During the game, Baudier heard a gun shot and immediately felt pain in his left hip as a bullet entered his body. As Baudier fell to the ground, he heard two more gunshots being fired. He thereafter witnessed the shooter run toward a red vehicle and speed away.
The physical injuries that Baudier suffered included a hole in his pelvic bone, and bullet fragments near his colon that can not be removed. Thereafter, Baudier also underwent weekly counseling to cope with psychological trauma that he endured as a result of the shooting.
Several months later, the individual who shot Baudier was identified as Patrick Cheron (“Cheron”), a minor. After his arrest, Cheron admitted to the shooting and further revealed that he shot Baudier as the result of a bet with a friend, Mark Levy. On the day of the shooting, Cheron was accompanied by Matthew Scalco, who ultimately drove the vehicle Cheron fled in. Scalco and Levy were also arrested and charged for their alleged involvement in the incident as well.
On May 16, 2000, Baudier filed suit in the Twenty Fourth Judicial District Court for the Parish of Jefferson against Patrick Cheron, his parents, James and Patricia Cheron (“the Cherons”), and them home *167 owners insurer, State Farm Fire and Casualty Company; Matthew Scalco, his father, and their insurer, and; Mark Levy, his father, and their insurer. The Scalcos and the Levys settled with Baudier prior to trial.
A jury trial began on May 12, 2008, during the course of which Baudier dismissed his claims against Patrick Cheron, individually, and also dismissed “negligent supervision claims” against Cheron’s parents. On May 16, 2003, the jury found that Patrick Cheron was 75% at fault, and Matthew Scalco was 25% at fault for Bau-dier’s injuries that resulted from the shooting. The jury further awarded Bau-dier $150,000.00 for “past and future physical pain and suffering and disfigurement”, $365,000.00 for “past and future mental anguish,” and $25,740.11 for past and future medical expenses.
It is from these awards that the Cherons have timely filed the present appeal.
LAW AND ANALYSIS
On appeal, the Cherons assert that the amounts awarded by jury for physical and mental pain and suffering were both excessive and constituted manifest error.
A jury verdict is a factual finding and cannot be disturbed on appeal unless the trial court committed manifest error or a finding of fact is clearly wrong.[1]
In regard to Baudier’s physical pain and suffering, the jury was presented with the following testimony and evidence:
First, the jury heard the testimony of Baudier himself, who described his initial pain after being shot:
The bullet hits me. And the only way I can describe it, and people have asked me over the last four years, what’s it feel like to be shot? What’s it feel like? Does it burn? The fact is, it didn’t burn me. What it feels like, and the only way I’ve been able to describe it, and some of you guys might know what a beanball hammer is. It looks like a maul. It’s about this big and it’s got a round head on it. But if you can imagine this little beanball hammer or maul on the end of a baseball bat, and somebody swinging it as hard as they can to hit a home run, when it hits you, that’s what it feels like. It hurts. It hurts bad.
At trial, Baudier recounted that he was then transported to the hospital, and described his pain threshold during that time as well:
[The pain] doesn’t stop. It just is there. And then my leg was in this up position. You couldn’t straighten it out. It was just paralyzed. And if you tried to straighten it out, the pain was so bad, that you couldn’t stand it ... Then the procedures that they do, which they have to do, it’s no question that they have to do these procedures are also painful.
Baudier was told by a treating physician, Dr. Hoffman, that he would experience pain sometimes because of the bullet fragments. Baudier testified that during his immediate recovery after the shooting, he walked around on crutches for a while, but was unable to put weight on his legs because it hurt him so badly. After some time had passed, his treating physicians at Southern Orthopedic told Baudier that there was nothing they could do for him other than to tell him to continue to do leg exercises and give him medication for the pain.
*168 One year after the accident, Baudier went to see Dr. Meyer. In regard to that time period, Baudier told the jury:
I found that walking hurt me more than-you know, I’d walk a block or two, and for some reason or other, it would hurt pretty bad. And I really couldn’t determine why ... So, I was kind of limiting my activities, because it hurt, painful.
The jury was further presented with Baudier’s testimony and evidence that, two years post accident, he was still having hip pain. One such example was documented in a visit to Dr. Finney on December 6, 2002.
Baudier testified that he made an effort to return to a regimen of running that was his routine prior to the shooting, but found it difficult because of the pain. On March 13, 2003, Baudier saw Dr. Claude Williams, at which point Baudier had managed to run up to three miles, but only with “really intense pain.”
At trial, Baudier testified that he was still experiencing pain from the injury.
The jury also observed the video deposition testimony from one of Baudier’s treating physicians, Dr. Hoffman, who recalled his treatment of Baudier for the hip injury. On May 25, 1999, several days after the shooting, Dr. Hoffman recalled that Baudier was walking with a cane, and appeared to be healing, however was “definitely” still in pain. On a June 22, 1999 visit, Dr. Hoffman noted that Baudier was still having hip pain and weakness, which is normal because of muscle trauma. Dr. Hoffman saw Baudier on May 1, 2003, one week before trial, and noted that Baudier complained of pain in both hips, which Dr. Hoffman thought might be radiating from the lower back. Hoffman opined that he believed that the complaints about lower back pain are related to the gunshot wound.
Dr. Hoffman further testified that the gunshot wound is the type of injury where Baudier is going to have to live with the pain as it comes in his future, and explained that the bullet fragments that remain in his tissue will serve as an irritant that could cause him future pain.
On cross examination, Dr. Hoffman was asked about Baudier’s treatment of a left thumb on May 2, 2001, related to “excessive golfing.” Dr. Hoffman admitted that excessive golfing could also be a cause of hip or low back pain.
The jury was also presented with the deposition testimony of Dr. Richard Meyer, who treated Baudier for his injury. During his deposition, Dr. Meyer was asked:
Does it tell you anything, by the fact that we’re now four years after the accident, and if he still gets pains like that when he does certain activities, what does that tell you about the nature and duration of the pain?
DR. MEYER:
Well, it implies that they are chronic symptoms at this point, and he’s likely to have these symptoms in the future.
In support of their position that the award for Baudier’s physical injury was excessive, the Cherons argue that the evidence suggests that Baudier’s hip injury resolved as early as May 2, 2001, or December 4, 2001 at the latest. They further argue that Baudier’s activities since the shooting, namely, jogging and skiing, are inconsistent with his claim that the pain and suffering are continuing. The Cher-ons further point out that Baudier’s physical injury since the shooting has not prevented him from being active at work or in the community.
In this case, the jury awarded Baudier $150,000.00 for “past and future physical *169 pain and suffering and disfigurement” for his hip related injuries. In disputing this amount, the Cherons cite to several Louisiana cases[2] in which shooting victims were awarded general damages for their injuries ranging from $40,000.00 to $75,000.00. Conversely, Baudier argues that the case cited by the Cherons are distinguishable, and that the awards cited, some as far back as 1977, do not take into account what those judgments might be worth today after an adjustment of inflation.
In Theriot v. Allstate Ins. Co.,[3] the Louisiana Supreme Court explained:
Our jurisprudence has consistently held that in the assessment of damages, much discretion is left to the judge or jury, and upon appellate review such awards will be disturbed only when there has been a clear abuse of that discretion. And, “it is only after articulated analysis of the facts discloses an abuse of discretion, that the award may on appellate review be considered either excessive or insufficient.” Appellate courts review the evidence in the light which most favorably supports the judgment to determine whether the trier of fact was clearly wrong in its conclusions. Before an appellate court can disturb the quantum of an award, the record must clearly reveal that the jury abused its discretion. In order to make this determination, the reviewing court looks first to the individual circumstances of the injured plaintiff.
Accordingly, after a review of the record, we do not find that the jury abused its discretion in awarding $150,000.00 in general damages to Baudier for his physical injuries, given the specific circumstances of this case, and we affirm this portion of the jury’s verdict.
Next, the Cherons assert that the jury’s award to Baudier for mental pain and suffering was excessive.
Regarding the issue of Baudier’s mental pain and suffering, the jury was presented with the following evidence and testimony. First, Mrs. Baudier testified as to Mr. Baudier’s behavioral changes after the shooting:
Well, he became very short-tempered with us. And it wasn’t with just — it wasn’t with most people, it was with his family. I mean, he became hard to deal with, hard to get along with, because he was so stressed out and worried, and he knew he couldn’t function like he did before. He was just — it was awful.
Mrs. Baudier ultimately recommended that her husband begin to see a mental health professional to receive help with problems that she felt she could no longer help Mr. Baudier with.
Next, Mr. Baudier himself recounted to the jury how he was affected mentally during the shooting:
And if there was ever a time when you felt like you were going to die, that’s the time. You know you’ve been shot, you know you’ve been hit. You know you’ve been hit hard.
He then described what it was like after he had been transported to the Metairie Country Club Clubhouse immediately after the shooting, when he couldn’t move his leg, and wondered if he was going to die.
At the hospital, Baudier was told by the head nurse:
*170 We don’t know whether or not there is anybody out there trying to kill you. And in order to protect us, and in order to protect you, we’re going to have to give you an alias, we’re going to give you 24-hour guards, and we’re also going to move you to a secure room. And during this time, no one will be able to come in and see you... .You will be in an isolation area, not even your wife, because we don’t know if she is even involved.
The threat of a second attack on his life was something that Baudier had to live with daily prior to the time that Cheron had been arrested. Shortly after the shooting, the Jefferson Parish Sheriffs Office gave Baudier the precaution of being careful where he went, who he saw and what he did.
When asked how he felt when the police were investigating his attempted murder, Baudier testified:
You feel horrible. I mean, you feel like, why does somebody want to kill me? What could I have done to do this? And you just start questioning yourself. What’s wrong with me?
Baudier told the jury that he had concerns about the safety of his family, and was constantly preoccupied with his surroundings when in public. Upon the advice of the police, he obtained a permit to carry a concealed weapon. He was always on edge during the days, and at night he had what he described as “horrific bloody nightmares.” He recalled the events of the shooting in vivid detail on a daily basis, and described how the shooting affected his marriage:
Well, my wife was very supportive, but she was also telling me, “You have to get passed this. You have to get over it ... We have to get back to real life.”... I have to take care of this problem. Because if I don’t take care of this problem, this problem is going to eat me alive. I’m not going to be able to do my job. I’m not going to be a good husband. I’m not going to be a good father. I can’t do anything.
Baudier told the jury about his constant fear from between May 17 and October 1999, that someone would finish the job:
[I]t was a real fear that there was somebody out there doing something to us, and we didn’t know who or where it was. So, every time we would leave our house and, of course, as I said earlier, I was asked to carry a gun, which I did, as we would walk out of a door ... we’d look around to make sure that there wasn’t anybody outside ...
So we always had to do that. It was a consistent threat and it was a constant fear, and we always felt this emotional fear ... Just all the time, it was out there forever.
Baudier said that he was shunned by associates after the shooting amid rumors that Baudier was shot because he was involved in drug deals, the mafia, or had a vengeful mistress, and that he was repeatedly questioned about the shooting with those he came into contact with. Even after Cheron was arrested, Baudier said that people he came into contact with still viewed him suspiciously, and, in the course of work and socializing, he was prompted to retell the story approximately 50 to 100 times in a single week.
Even in spite of his counseling, Baudier testified:
And there’s always regression where you go back and you have to deal with that again. And there are always people who really do want to know and there are always people who want you to relive this rather traumatic event that you have, and they always bring back these emotions to you ... It doesn’t stop.
*171 And I think that I almost lost my family. I was almost thrown out of the house for being whatever I was. I almost lost my business because I couldn’t communicate. I almost lost my livelihood, because I couldn’t work in the job I used to work.
The jury also heard the testimony of Eliot Levin, a psychotherapist trained as a clinical social worker, who saw Baudier on a weekly basis from March 2001 until January, 2003. Levin gave the jury the following overview of Baudier’s symptoms:
The type of event that Mr. Baudier was involved in, is similar to someone who has been raped, someone who has been held up at gunpoint ... that’s a similar type.of trauma where the symptoms afterwards are very similar to the ones Mr. Baudier described. Anyone suffering some sort of shock that they weren’t expecting, particularly when it comes to something that was violent, is something that is going to show some similar symptoms and last over generally the same period of time is going to last quite a long time in terms of how their symptoms will persist or show up for years and years.
And, to some degree, it paralyzes you. It paralyzes your decision-making. It paralyzes you in expressing emotions. It makes you terrified of what people would think about why would somebody shoot me.
Levin then described Baudier’s symptoms for the jury:
... [L]arge mood swings, extreme sadness and pain, emotional pain that you can’t get past the sadness, heightened fears, being afraid of everything ... The inability to function well at work. The inability to function very well at home. Tremendous amount of replaying the event. The inability to sleep very well.
In Levin concluded that Baudier’s emotional damage is chronic, and will go on “for a very long time.” Levin also stated that there would be improvement in Baudier’s condition, but that there would also be regression as well.
The Cherons produced no witnesses at trial relating to Baudier’s mental injury. On appeal, however, the Cherons contend that the award is excessive for several reasons. First, they argue that Baudier was never diagnosed with either major depression or with Post Traumatic Stress Disorder by Levin, who they deem to be a “mere social worker.” Next, they cite to lower damage awards in Louisiana cases in which a plaintiff was shot and injured. Then they contend that Baudier himself testified that he felt relief from his stress and concern after Cheron was arrested as the shooter. They further claim that there was an absence of evidence, other then plaintiffs own testimony, that rumors were circulating about his alleged involvement with unseemly elements that led to his shooting. The Cherons also assert that Baudier never reported any feelings- of anxiety, fear or depression or any other mental or emotional problem to his treating physicians.
Even in the absence of a medical diagnosis, it is apparent from a review of the record that Mr. Baudier has experienced significant pain and anguish in this circumstance.
In the midst of the shooting, Baudier recalled that he was required to face his own mortality. Thereafter, Baudier was advised by law enforcement officials that they could not guarantee his safety against an assailant who could have returned to murder him, and he lived his life for a period of time in understandable fear prior to the time that Cheron was arrested for *172 the shooting. In the aftermath of the violence against him, the record suggests that Baudier suffered an emotional strain that affected his self-image, marriage, and career.
In the present case, as previously discussed, the jury was presented with the testimony of several witnesses, including the victim and a mental health professional, who detailed the severity and duration of the emotional distress that Baudier suffered as a result of being shot by the defendant. This evidence was unrebutted at trial. It is also undisputed, however, that no medical diagnosis was ever made regarding Baudier’s claimed symptoms resulting from the attack. Baudier argues that the evidence presented at trial shows that he suffered emotional problems very similar in nature to those diagnosed with Post Traumatic Stress Disorder (PTSD), and that therefore, the jury award should be reviewed in light of other cases where victims of a violent crime have been awarded substantial sums for their PTSD which resulted from the criminal activity.
Conversely, the Cherons assert, however, that the jury’s award for emotional damages is inconsistent with the quantum found in other similar Louisiana cases where a plaintiff was shot and claimed an emotional injury. Specifically, the Cher-ons rely on the several cases[4] in which the total damage award, some including awards for mental anguish, ranged from $40,000.00-$75,000.00.
The Louisiana Supreme Court noted in Theriot v. Allstate Ins. Co.:[5]
Prior awards under similar circumstances serve only as a general guide. If the appellate court determines that an abuse of discretion has been committed, it is then appropriate to resort to a review of prior awards, to determine the appropriate modification of the award. In such review, the test is whether the present award is greatly disproportionate to the mass of past awards for truly similar injuries. See, Reck v. Stevens, supra, 373 So.2d 498 (La.1979); Wactor v. Pickens Lumber Co., 505 So.2d 815 (La.App. 2d Cir.1987), writ denied, 508 So.2d 827 (La.1987). In instances where the appellate court is compelled to modify awards, the award will only be disturbed to the extent of lowering or raising an award to the highest or lowest point which is reasonably within the discretion afforded the trial court. American Motorist Insurance Company v. American Rent-All, Inc., 579 So.2d 429 (La.1991); Scott v. Hospital Service District No. 1 of the Parish of St. Charles, 496 So.2d 270 (La.1986); Carollo v. Wilson, 353 So.2d 249 (La.1977); Coco v. Winston Industries, Inc., supra, 341 So.2d 332 (La.1976).
*173 Louisiana courts, including this one, have previously upheld large awards to victims of violent crime that have included damages for mental anguish.[6] General damages, however, do not have a common denominator, but are decided on a case-by-case basis.[7] We note that in affirming awards to victims of crime, the courts almost invariably rely on a record which contains a medical diagnosis that sufficiently documents the plaintiffs mental injury. Such a diagnosis does not exist in the record before us. However, we distinguish the facts of the present case from those in cases cited by appellees in support of a lower award for mental damages. Specifically, we find that a cumulation of factors, including the five months during which Baudier was unsure of whether a second attempt would be made on his life or on the lives of his family members, makes for a stark contrast against other cases where the injurious act itself quickly resolves, thereby leaving the victim free to begin a process of mental healing. Here, not only was Baudier required to sustain the trauma of being shot the first time, he was realistically required to relive the fear and anguish of his experience daily until his would-be assassin was arrested for the crime. Accordingly, after a review of the record in this case, we find that, even in the absence of such objective medical diagnosis or documentation, the award of $365,000.00 to Baudier was not an abuse of the jury’s discretion.
For the foregoing reasons, we affirm the jury’s award of $150,000.00 in general damages, and $365,000.00. in mental damages. In all other aspects, the jury’s award is affirmed.
AFFIRMED.

. Mart v. Hill, 505 So.2d 1120 (La.1987), citing Arceneaux v. Domingue, 365 So.2d 1330 (La. 1979).

. Lawrence v. Hartsuck, 383 So.2d 453 (La.App. 4 Cir. 1980); Barker v. City of New Orleans, 503 So.2d 536 (La.App. 4 Cir.1987); Matthews v. Felps, 515 So.2d 545 (La.App. 1 Cir.1987), and Frank v. Pitre, 341 So.2d 1376 (La.App. 3 Cir.1977), reversed on other grounds, 353 So.2d 1293 (La.1977).

. 625 So.2d 1337 (La.1993).

. In Lawrence v. Hartsuck, 383 So.2d 453 (La.App. 4 Cir.1980), the court awarded $50,000 in general damages, however, and award for mental damages was not specifically discussed. In Barker v. City of New Orleans, 503 So.2d 536 (La.App. 4 Cir.1987), the court reduced an award of $544,101.19 to $75,000 in general damages, finding in part that the plaintiffs emotional injury was not supported by the record as being chronic or severe. In Matthews v. Felps, 515 So.2d 545 (La.App. 1 Cir.1987), the court raised the amount of the award to plaintiff to $40,000, noting in part that at the time of the shooting, plaintiff didn't know if he would die or be paralyzed for life. In Frank v. Pitre, 341 So.2d 1376 (La.App. 3 Cir.1977), reversed on other grounds, 353 So.2d 1293 (La.1977), the court affirmed an award of $41,004 to a policeman who sued to recover for injuries sustained when he was shot by a prisoner.

. 625 So.2d 1337 (La.1993).

. Morris v. Yogi Bear’s Jellystone Park Camp Resort, 539 So.2d 70 (La.App. 5 Cir.), writ denied, 542 So.2d 1378 (La.1989); Louviere v. Louviere, 2001-0089 (La.App. 1 Cir. 6/5/02), 839 So.2d 57, writ denied, 827 So.2d 1150 (La.), writ denied, 827 So.2d 1151, writ denied, 827 So.2d 1152; Smith v. Orkin Exterminating Co., Inc., 540 So.2d 363 (La.App. 1 Cir.1989).

. Coscino v. Wolfley, 96-0702 (La.App. 4 Cir. 6/4/97), 696 So.2d 257.