904 So.2d 867 (2005)
Mary BURGARD and Donna Triay
v.
ALLSTATE INSURANCE COMPANY, Louisiana Farm Bureau Insurance Company, Earl Robby Brock and Bobby and Romona Brock.
No. 04-CA-1394.
Court of Appeal of Louisiana, Fifth Circuit.
May 31, 2005.
*868 Dominic J. Gianna, Wade P. Webster, Marianne Garvey, Middleberg, Riddle, & *869 Gianna, New Orleans, Louisiana, for Plaintiff/Appellant.
Andrew L. Plauche, Jr., Plauche Maselli, Landry & Parkerson, L.L.P., New Orleans, Louisiana, for Defendant/Appellee.
Panel composed of Judges MARION F. EDWARDS, SUSAN M. CHEHARDY, and CLARENCE E. McMANUS.
MARION F. EDWARDS, Judge.
Plaintiff/appellant, Donna Triay, appeals a jury verdict against defendants/appellants, Allstate Insurance Company, Louisiana Farm Bureau Insurance Company, Earl Robby Brock, and Bobby and Romona Brock.
Triay filed suit, alleging that on July 22, 2000, she was injured when her Ford Explorer was struck by a Mazda truck operated by Robby Brock. The matter was tried before a jury. Prior to trial, the parties entered into a stipulation that the accident was the result of the fault and negligence of Brock; that at the time of the accident, Brock was underinsured and that Louisiana Farm Bureau had in effect a UM policy issued to Triay with a primary limit of $300,000 and an excess of $1,000,000. The only issue left to the jury was the amount of damages due each plaintiff with certain qualifications. Of concern on the current appeal are the stipulations that any award for medical payments would be subject to a credit of $10,000 for payments previously made, and that any damages awarded Donna Triay would be subject to a total credit of $310,625 (in addition to the credit for medical payments), plus an additional credit of $2,000 already paid from Brock's insurer.
Following trial, the jury returned a verdict in favor of Triay in the total amount of $268,405 for her damages; $35,416 to her husband, Jimmy; and $9,583 to each of her children. In the resulting judgment, Triay's claims were dismissed in accordance with the above stipulation. Triay alleges that, due to errors made during the course of the trial, the verdict is grossly inadequate in light of the evidence.
Diane Hickman, Triay's sister, was in the Explorer with Triay on the day of the accident, along with their mother, and Triay's daughter, Candace. Hickman was pregnant at the time. The Ford was hit very forcefully from the rear, causing it to hit the guardrail, spin, and flip three times. Each time the truck turned over, the roof of the vehicle crushed in more, and they were very frightened. When the vehicle came to rest, it was upside down, and Hickman managed to unbuckle her seatbelt and get her niece out. They exited the SUV from the rear, but Donna was later extracted by medical personnel. Donna looked frightened and very bloody. Hickman herself had a broken collar bone and temporarily went into labor. Hickman saw her sister the next day, in the ICU unit at the hospital, where she looked "horrible."
Before the accident, Donna was the life of the party, very outgoing. She was organized and never forgot anything. After the accident, Donna became distant and has problems with her short-term memory. Her personality has changed, and she has lost a great deal of her patience. She only hears pieces of conversations. Donna does not complain. Before the accident, Donna did not have marital or psychiatric problems, or problems with memory or mathematics. However, Hickman did not know much about their finances or business arrangements.
Mary Burgard, Triay's mother, testified that after the impact, when the Explorer hit the guardrail, it looked as though they would go over into the water, then the car flipped and bounced three times. Since the accident, Donna has a short-term memory *870 problem, and her personality has changed. Before, she was genuinely happy, but now she worries a lot, tires easily, and gets headaches. Her loving personality has not changed.
Triay and her husband owned a printing business, Printers Wholesale Group Inc., where Triay managed the day-to-day finances and was the bookkeeper. Triay also had another business, Crescent Graphics and Printing. Darlene Billiot, who was employed by the Triays' business accountant, Reginald Bresette, testified that before the accident, Triay would timely bring her financial information, but afterwards, she needed to be reminded to do so. She also became forgetful about bills, sometimes not paying them at all and sometimes paying them twice. Triay would forget to place and process orders. She was formerly very sharp and upbeat, but now her forgetfulness gets her down. On cross-examination, Billiot examined checks written from the businesses and determined that, prior to the accident, monthly payments to Bresette from both Crescent and Printers were not written for several months, although she also testified that Bresette did not always promptly send out its statements. This would sometimes result in the Triays' businesses having to pay multiple statements to Bresette in a single month. Further, on at least one occasion a bill to Crescent was paid with a Printers' check, which Billiot stated may have been a mistake by Triay, unless there was not enough money in the Crescent account to pay the bill.
Bob Cole, a customer of Printers, testified that he knows Triay and since the accident, she does not always send billings, she is not at the office nearly as much, and she is just "different."
Donna Triay testified that, prior to the accident, she handled all the accounting work for Printers, and she and her husband ran the business together. She enjoyed the work, working eight hours at the office and then at home in the evenings. She also handled sales calls, customer service, and whatever else had to be done. She was good at math and reading and enjoyed activities such as biking and boating.
When the accident occurred, as the car rolled over she thought they were going over the bridge and that she had to save her family. Since the accident, she is different at work because she constantly makes errors that are later brought to her attention. With regard to her family life, she has tried to go on with daily activities. She has problems remembering things, and this embarrasses her. She is tired all the time, has frequent headaches, and cries a lot for no reason. Triay claimed past lost income for only the year of the accident, 2000.
Jimmy Triay testified that he has been married to Donna Triay for seventeen years. For the first few months after the accident, she stayed home. Her head was swollen and she had headaches constantly. Triay does underestimate her discomfort and often worked when not feeling well. Prior to the accident, he would sell the printing and Triay would do the paperwork and bookkeeping. Triay was totally together, full of life, and loved to go on trips. They worked long hours. She wrote most of the checks, was good in math, and had good concentration. Since the accident, Triay is at the office only two to five hours a week. She does not pay attention anymore, does not transmit messages, and does not concentrate. She makes mistakes in check writing, overpaying bills on many occasions. After stopping the sales portion of the day, Mr. Triay has to go to the office to do bookkeeping and paperwork. Nevertheless, the evidence at trial showed that Triay *871 began writing business checks again as early as August 2, 2000. Between 1999 and 2000, the business was relocated and Jimmy Triay expected expenses to increase.
According to her husband, Triay is a "scared person," and has many phobias. If they drive over a bridge, she shakes. She does not play with the children anymore, she does not respond to him, and she rarely finishes books she is reading. She is easily annoyed and gets angry at herself when she forgets things. She is no longer interested in a physical relationship, and they argue about this. Triay did go on several trips to Florida with her husband after the accident, and clips from home videos showed Triay's activities on vacation, and on family outings. Triay continued to enjoy watching her sons play baseball and perform musically.
Dr. Richard Roberts testified that he was the emergency room physician at River Oaks Hospital where Triay was taken after the accident. According to the EMT records, Triay was alert and oriented as to person, place, and time. The report also indicated that she had not lost consciousness. Triay tested normal on the Glasgow Coma Test, which is an estimation of consciousness. At the emergency room, Triay was coherent and partially described the accident. The main injury was to her head, where she developed a pronounced subgaleal hematoma  fluid had accumulated between her scalp and her skull. She had "raccoon eyes," one of the stigmata indicating a basilar skull fracture. She also had a "battle sign," a black and blue area over the back of her head, which also indicates fracture. Sometimes, these kinds of fractures do not show up in X-rays. Injuries like this often cause a patient to suffer post-concussion syndrome. There was no complaint of numbness, tingling, or radiating pain, which would tend to rule out a spinal injury.
On cross-examination, Dr. Roberts testified that the deployment of the air bag could have caused black "raccoon" eyes, and Triay had remembered the air bag going off. Triay was "neuro intact" in the emergency room. Several other indicia of skull fracture were not present, such as blood behind the ear drum, crepitance, and normal eye movement. The report on the skull X-ray indicated no fracture, there was a negative CAT scan, and the facial X-rays were largely negative. There was no discharge from her nose or ears indicating seepage of spinal fluid. There was an injury to her hand, and numerous abrasions, but no evidence of other serious injuries.
Dr. Roberts notified the neurosurgeon on call, Dr. William Johnston, who recommended that Triay be admitted and retested. Triay was admitted to ICU, and Dr. Roberts did not see her after that. Dr. Roberts stated that, in his opinion, Triay had suffered a basilar skull fracture but would defer to Dr. Johnston as to her subsequent condition.
Dr. Grant Butterbaugh was qualified as an expert in neuropsychology and psychology. He testified that Triay was referred to him by Dr. Howard Osofsky for evaluation. Dr. Butterbaugh reviewed most of her medical record prior to seeing her in September and October of 2002. The purpose of his evaluation was to determine whether Triay had a brain injury and whether she had other problems such as learning disabilities. Dr. Butterbaugh spent sixteen hours with Triay over a period of two days, administering standardized tests as well as taking a personal history. Dr. Butterbaugh found no evidence that she was exaggerating symptoms, but was rather more likely to minimize them. The physician was particularly interested in *872 her emotional functioning, as she had reported insomnia, nightmares, and fear when in an automobile. As a result of the tests, it was determined that her cognitive function in math decreased since the accident, and that her ability to continue her bookkeeping functions was impaired. Dr. Butterbaugh disagreed with another evaluation that stated Triay had a history of math problems, finding in her school records that she had been above average in that area. He had not examined checks she had written either before or after the accident, so as to determine any patterns she may have had in that area. Dr. Butterbaugh assessed that she was not able to perform her bookkeeping functions as well as she had previously done. Triay told him that she had to hire others to do the job she had previously performed herself, and she was making mistakes. Triay also had problems with decreased reading comprehension.
At the time of the exam, Triay still had intermittent problems with dizziness and headaches, as well as with balance. She is at risk for a more serious head injury if she has another head accident. Dr. Butterbaugh determined that Triay had suffered a mild traumatic brain injury and that she suffers from post-traumatic stress disorder, anxiety disorder, and cognitive disorder. In the doctor's opinion, Triay would probably remain this way.
Dr. Jose Calderon testified as an expert in the field of psychiatry. Dr. Osofsky referred Triay to his care and he saw her initially in January 2003. She had stopped seeing her previous psychiatrist, Dr. Culver, about a year before, because she was uncomfortable with him. Dr. Calderon found that, after the accident, Triay began to struggle with depression, anxieties, panic attacks, and phobias. She had cognitive difficulties and was no longer able to multi-task. She tended to minimize her symptoms. Dr. Calderon diagnosed her with post-concussion syndrome, in which a blow to the head does not cause major brain injury, but which does affect different areas of the brain. She also suffers from depression, secondary to the head injury, as well as post-traumatic stress disorder. She experienced nightmares and flashbacks to the accident. These are chronic conditions which will not soon disappear. On one occasion, she drove to Florida with her husband, although she dreaded the drive, but once there she had a good time. On returning, however, she was significantly more depressed and anxious, with more nightmares and insomnia.
Litigation could be a stressor, and when it is over, Triay could have some symptomatic improvement. She has also had stress from health problems and other situations unrelated to the accident. Triay experienced chest pain and difficulty swallowing which were not related to heart problems, but which were likely due to anxiety. Dr. Calderon has started giving her medications that may help her depression and anxiety. However, she does not like to take medication on a daily basis, although she would take some medicine occasionally. Certain medication that had been given her by Dr. Culver had helped with the crying spells and sleep disturbances, but Triay did not like them because they caused her to gain weight and made her sleepy throughout the day. The anti-depressant medication she is taking will not help the nightmares and flashbacks, because that is from post-concussion syndrome, and she will continue to suffer these symptoms and continue to have cognitive problems indefinitely. She continues to have panic attacks around the month of July. She will continue to need medication and treatment, but the doctor could not give an estimate as to how long treatment would be necessary or how much it might cost.
*873 At this time, Triay can take care of her family, but with more difficulty than before the accident. In the doctor's opinion, Triay's condition is related to the accident.
Dr. William Black, a clinical neuropsychologist and professor of psychiatry at Tulane University, testified as an expert in the field of neuropsychiatry. He evaluated Triay on July 12, 2001. Following his evaluation, Dr. Black concluded that the accident caused some of her problems and exacerbated others. In her tests, she had notable difficulty in verbal intelligence, and was in the low average range; she also had relative difficulties with certain aspects of verbal memory and with basic computational arithmetic. Abstract reasoning and problem solving were "very, very significantly abnormal." Triay had significant emotional problems, some of which were probably directly related to the neurological effects of the brain injury and which probably contributed to some of her scores. It is difficult to say how much of her problem is neurological and how much is psychiatric. Triay sees some things as being more difficult than they really are, and made many errors on her tests. However, there is absolutely no evidence of malingering or exaggeration on her part.
According to her history, Triay did not have pre-existing problems with math; however, Dr. Black was "equivocal" in determining whether the decrease in that area of Triay's functioning was more neurological or psychiatric  he suspected both components were present.
Personality profiles were administered. The results of the tests for anxiety and depression were nearly normal, but Dr. Black was able to conclude, from his observation, that Triay was underreporting her symptoms and was obviously both depressed and anxious. All the tests show that she is emotionally distressed. The accident has caused a physiological disruption in the brain, and Triay's brain is not working properly. Her emotional response to the entire incident has been dramatic, and her day-to-day function is negatively affected by her emotional state. Although many people have therapy and go on to have a normal life, in his opinion, Triay is obviously in that fifteen percent of patients who just don't get better.
In his report, Dr. Black concluded that his findings represented a post-concussion syndrome that has been exacerbated and perpetuated by marked emotional distress. "The protracted nature of Ms. Triay's constellation of problems has likely resulted from her ongoing efforts to deny them, thus interfering with her ability to cope with her situation and move forward towards recovery."
Dr. Howard Osofsky, a professor and chair of the Department of Psychiatry at LSU Health Sciences Center, was accepted as an expert in the fields of psychiatry and psychology. Dr. Osofsky had treated many patients who had suffered brain injury and post-concussion syndrome. He saw Triay for evaluation in August, September, and November of 2002. Dr. Osofsky took a history and found that she was extremely cooperative, but tended to want to portray herself as doing better than she actually was. There was nothing in her history, prior to the accident, which could have caused any psychiatric or emotional problems. Triay told Dr. Osofsky that she had problems with her psychiatrist, Dr. Culver. Although Dr. Culver had found her to be obsessive/compulsive, Dr. Osofsky determined that, in his experience, persons who had a head injury with complications try harder to cope by concentrating and taking notes. Persons who have what look like mild injuries can also *874 have significant degrees of traumatic injury or difficulties with cognitive thinking.
In Dr. Osofsky's opinion, Triay suffered a traumatic brain injury that led to post-concussive syndrome. Persons with this type of injury can function in daily life, but could have impaired judgment in certain areas that would make them non-functional in their work. Some of Triay's mood symptoms are rooted with some of the neurons that were knocked out, and some with the problems she currently has to cope with. She will probably continue to have difficulty doing bookkeeping, and difficulty with memory, although she may learn to better cope with these problems. She can have a "decent" life doing a number of things to the best of her ability. Taking anti-depressants can help mood-related symptoms but will not make her well. Dr. Osofsky did not know why there was a time from February of 2002, when Triay stopped seeing Dr. Culver, to November 2002, when she began seeing Dr. Calderon. However, Dr. Osofsky thought that she may have felt that she made some improvement during that time, but that she was underestimating her condition. She has strong coping skills.
Dr. Jonathan C. Caukwood was qualified as an expert in neurology and neuroophthalmology. A neuroophthalmologist is a doctor who deals with neurological disorders that affect vision. Triay had complained about episodic visual blurring, flashes in her vision, associated with headaches. After examination, Dr. Caukwood determined that Triay suffered from a partial loss of peripheral vision in her left eye and damage to the left optic nerve which was more probably than not caused by the accident. However, this partial loss of peripheral vision probably does not affect her on a daily basis. Triay should be monitored for the next two to three years.
Dr. William Johnston testified as an expert neurosurgeon. The diagnosis from the external examination was that Triay had suffered a frontal basilar skull fracture in the accident, even though it did not show up on the X-rays. It is not unusual that such a fracture would not show up on an X-ray because the bone is so dense. The fact that she was aware and alert on examination was an indication that her injury was not major. There was no evidence of bleeding inside the skull, seizures, or spinal fluid leakage. She suffered from post-concussion syndrome, which is the collection of symptoms involving relatively mild complaints such as headache, irritability, insomnia, and difficulty concentrating. Ten to fifteen percent of people who suffer post-concussion syndrome have ongoing difficulties years after the trauma. There was no indication of bleeding into the brain, swelling, or spinal fluid leakage, but her cognitive malfunction is evidence of a more subtle type of injury. A neurological exam ten days after the accident disclosed intact cranial nerves and visual fields intact, and subsequent exams essentially disclosed improvement in her condition. An MRI was within normal limits. Triay was discharged, but returned five months later, in March 2001, complaining of frequent headaches, a new symptom, and also experienced neck pain. At that time, Dr. Johnston did not find a cause for the headaches, but another MRI was ordered, again showing a normal result.
In April 2001, neck X-rays, an MRI of the neck, an EMG, an EEG, and a nerve circuit test were ordered. The results were normal, detecting no obvious focal deficiency. The MRI of the neck showed slight bulging discs in the cervical area. The working diagnosis was that the skull fracture and cerebral concussion syndrome were resolved, and she is neurologically stable.
*875 During treatment, issues relating to depression and cognitive ability arose and Dr. Johnston referred Triay to Dr. Black for evaluation and psychometric testing. Dr. Black opined that Triay's symptoms were the result of injuries suffered in the accident.
Dr. Rennie Culver testified as an expert psychiatrist. He testified that Dr. Johnston referred Triay to him. After evaluating her, he determined that, although she was quite depressed and had feelings of inadequacy and guilt, she tended to deny emotional distress. She had a judgment disorder, meaning that circumstances in her life caused emotional difficulty, as well as depression. She is a perfectionist and likes to be in control of everything. Dr. Culver prescribed an anti-depressant and psychotherapy. At first, Triay did not want to take the medication, but she eventually tried it and did well on it, stating that she slept better and was better able to cope.
During the time that Dr. Culver saw her, she continued to be active in her husband's business and go on with the activities of daily living, although she was uncomfortable. The litigation was stressful. She continued to take the medicine until April of 2002, when she began to complain that she did not like to put chemicals in her body and that it made her gain weight. During the time that Dr. Culver was trying to wean her off the medication, he felt that within six months she would not need psychiatric care. In August 2002, Triay told him she would not be returning and had not taken the prescription for several months. Dr. Culver opined that she suffered emotional problems from that the accident and that the accident caused or contributed to her condition.
Dr. Ivan Bank testified as an expert optometrist. He had treated Triay since 1987, and since the accident, she is not very responsive and has a difficult time in the exam room. He has seen her six times since the accident, and in her regular care, in fitting her for contact lenses, she has decreased vision that was appropriate for many people as they age. Dr. Bank agreed with Dr. Caukwood that Triay should be monitored in the future with a visual-field examination, and scanning scopes of the back of the eye, retina, and optic nerve.
Dr. Herbert Marks, an otolaryngologist, head and neck surgeon, treated Triay in November 2000 for complaints of dizziness. Hearing and balance tests were performed, in which mild hearing loss was detected. Such a hearing loss is not uncommon after a closed head injury. Dr. Marks determined that the dizziness symptoms were related to a post-concussion problem, and it is not unusual for a patient to develop dizziness weeks after an accident. Triay came in on two other occasions and did not complain of dizziness. The tests were repeated two years later, and there was a progression in the inner ear balance problem. The right inner ear is beginning to "drop out" in comparison to the left. If Triay moves her head suddenly, she may become dizzy and be disoriented until her inner ear readjusts. Inner ear balance disorders can fluctuate, but if brain damage is involved, balance problems tend to be constant. In Dr. Marks' opinion, there is no question that this is the result of the post-concussion event, and the accident caused or contributed to Triay's condition. Since it has continued several years after the accident, it is likely to be a permanent problem.
Dr. Donald Dietze, a neurosurgeon, testified that he saw Triay in October of 2001, at which time she was complaining of headaches, burning in the neck and pain *876 into her shoulders, pain in the left knee, bilateral posterior hip pain, and scattered thinking. Dr. Dietze examined Triay and reviewed her medical history and stated that the headaches and memory deficit were common to people with post-concussion syndrome. Dr. Dietze also found elements of depression. Based on the evidence, including Dr. Black's tests, Dr. Dietze concurred with the diagnosis made by Dr. Johnston that Triay had suffered a basilar skull fracture or, in his terms, a closed head injury. The memory deficit suggests injury to the mesial temporal lobes, typical for a closed head injury. The neuropsychiatric testing suggested a parietal lobe dysfunction, which is manifested by depression, and problems with coordination and dexterity. Triay also exhibited a mild malfunction in her right hand.
In a second visit, after Dr. Black repeated neuropsychiatric testing, Triay's neck and back were improved but the dizziness was more prominent. Triay's depression had improved. Dr. Dietze recommended Triay go into brain rehabilitation at Touro Infirmary, which she did. However, at this point in time after the accident, Triay will probably not improve. According to Dr. Dietze, Triay suffers from five percent whole body impairment with neck and persistent shoulder pain; ten percent impairment for depression, anxiety, and mood disturbances; and ten percent for the traumatic brain injury, incorporating a memory deficit. Triay's experience of life will be different. Although she appears normal, and can set up goals, she has problems carrying out her plans and needs help; she needs to take notes and have others remind her of things.
For the defense, Dr. William Martin, a neurologist, testified that he reviewed Triay's medical records and conducted two clinical examinations of her in early 2002. The clinical neurological exam, which took about a half-hour, was normal, with no evidence of disease or injury to the brain, spinal cord, spinal nerve root, or peripheral nerve. Dr. Martin did not take any tests such as a CT scan or MRI, nor did he do neuropsychological testing. He felt that the tests conducted on Triay after the accident did not provide objective evidence of a basilar skull fracture, although such fractures do not always appear on X-ray. Dr. Martin did not disagree with Dr. Black's diagnosis of a fracture. Triay had suffered post-concussion syndrome for about eight months.
There was mild high-tone hearing loss and her headaches had improved. The neuropsychological examination revealed that Triay was of average intelligence, although on academic testing she was deficient in arithmetic while normal in reading and spelling. She had significant depression and anxiety and was under the care of a psychiatrist who had prescribed an anti-depressant. At that time, Dr. Martin hoped that some of the cognitive symptoms would improve as the depression cleared, and he believed that the depression was at the root of many of her problems. In his opinion, Triay's post-concussion syndrome had gone into remission.
Dr. Martin examined her a year later, in February 2003. Triay had been weaned off the anti-depressants, at which time some of the post-traumatic stress symptoms, such as panic attacks and anxiety, returned. She continued to have crying spells, difficulty with concentration, headaches, and dizziness related to periods of depression. This suggested that the symptoms were psychophysiological in etiology, and despite the improvement she had made while on anti-depressants, she elected not to take them. Although her *877 depression may have been related to post-traumatic stress disorder, she did not have post-concussive syndrome. Her symptoms were due to chronic anxiety and depression, and the problems of post-concussion syndrome can be exacerbated by depression.
Dr. Kevin Bianchini, a clinical psychologist and neuro-psychologist, was retained by Louisiana Farm Bureau. He testified that he reviewed Triay's medical records and in January of 2003, Triay came into his office where she was administered a number of neuropsychological tests. Sometimes normal people, for various reasons, will have abnormal scores. Dr. Bianchini agreed that fifteen percent of patients who suffer a head trauma within the range of Triay's continue to have symptoms after six months. Within that percentage is a group that suffers no organic brain injury, but experiences a psychological overlay and symptoms of persistence. Triay demonstrated several symptoms of such psychological overlay and is in the category of persons who suffer prolonged post-concussion syndrome. The tests that Dr. Bianchini performed indicated that Triay's verbal intellectual abilities were lower than expected and reduced performance on another test that was sensitive to attention and concentration problems. Given her educational experience, her reading score was above expectations while her arithmetic was below expectations. Her performance on higher cognitive function tests was mixed, but there was no evidence of malingering.
She needs care for her emotional problems and depression in order to recover, and ending the litigation would help. She should be re-admitted to rehabilitation at Touro for three to four months, which would cost about $900 per week.
Dr. Stuart Wood, an associate professor of economics and finance at Loyola, was qualified as an expert in the calculation of lost wages. He reviewed the personal tax returns of the Triays as well as the corporation tax returns of Crescent and Printing, Inc. for 1997-2002. He also had the financial statements for the companies for 2003. Dr. Wood calculated that Triay lost $15,871.97 in wages in the year 2000. The future lost income calculations were made using her 1999 wages as a base, and assumed a three percent growth in income from her 1999 wages to the present. Dr. Wood further assumed that she could work full time at minimum wage, and subtracted the minimum wage amount from those figures. The present value of her future lost income, based on a working life expectancy of 13.17 years, was between $203,668.19 and $237,113.36.
On cross-examination, Dr. Wood was shown a number of checks from Printers and Crescent to Triay in 2000-2001, most in the amount of $1,000 each, that he had not seen in making his calculations. However, he had considered wages paid by the corporations that had been reported on the tax returns. Dr. Wood did not consider Mr. Triay's income, or the income of his business, since these were not items for which damages were claimed. Triay's W-2 forms show that her income went from $8,249.53 in 2000, to $40,200 in 2002.
John Theriot, a forensic accountant called by Farm Bureau, was qualified as an expert in computing economic wage loss. Mr. Theriot examined bank statements, income tax returns, and various other documents in connection with his testimony. The Triays had closely held businesses which allow for various means of compensation. Compensation can be in the form of wages, benefits, ownership of the business, and draws. Compensation may, in family-held businesses, be self-directed for purposes of retirement planning, social security, and tax planning. *878 Here, total family income is not only what is paid to the Triays but also the profits from the business. According to a chart prepared by Mr. Theriot, the family income was as follows:

 1997  $119,000.00
 1998  $100,000.00
 1999  $ 98,000.00
 2000  $ 45,000.00
 2001  $ 96,000.00
 2002  $157,000.00

The dip in income between 1999 and 2000 is reflective of the relocation of the business during that time period. Because Donna Triay is an owner of the business entities, to determine her income loss, her share of profits must be measured along with her wages as an employee of the businesses. Examining the documents, Mr. Theriot found there was a very clear pattern that, in some periods of time, Triay was given a wage, and in others, the wage stopped and she took a profit. For example, in the year 2000, Triay earned $8,596 in wages, but in 2001, she took no salary but took $12,000 in profit. Mr. Theriot calculated the average amount of deposits for the businesses both before and after the accidents, and determined that the deposits after the accident were almost double the amount prior to the accident. In the year 2000, gross income from the businesses declined about $40,000. Assuming that half of the loss was related to ordinary economics, including relocation of the business at that time, there was a past loss income of approximately $20,000. Assuming that business would have continued to improve in the 2003 tax year, for which tax returns had not been filed, future loss of profits would be zero.
Mr. Theriot found, in examining the checks, that Triay was signing about ninety-eight percent of the checks and, from an accounting standpoint, was doing the same amount of work after the accident as she was before. Thus, he did not believe that any downward salary adjustment could be due to a decrease in her work. On cross-examination, Mr. Theriot agreed that he based his opinion of Triay's future lost earnings on an assumption that she could return to work earning exactly what she had previously earned. He did not consider any of the medical reports or evidence in determining Triay's future earning capacity. However, Mr. Theriot did determine that Triay did a good job of bookkeeping both before and after the accident.
In the jury verdict, the $268,405 award to Triay was divided as follows:

 Past Physical Injuries, Pain and Suffering ....... $47,916.00
 Future Physical Pain and Suffering ............... $47,916.00
 Past Mental Pain, Psychological Injury and
 Suffering ........................................ $42,500.00
 Future Mental Pain, Psychological Injury
 and Suffering .................................... $42,500.00
 Past Loss of Income .............................. $14,166.00
 Future Loss of Income ............................ $ 4,250.00
 Past Medical Expenses ............................ $25,407.00
 Future Medical Expenses .......................... $10,000.00
 Loss of Enjoyment of Life, Love, Affection,
 Companionship, and Society ....................... $33,750.00

On appeal, Triay contends that several legal errors occurred that mandate this Court to make a de novo review. Triay urges the court erroneously admitted irrelevant evidence concerning Jimmy Triay's earnings and irrelevant evidence relating to income made by Printers, which evidence unduly prejudiced the jury in awarding general damages as well as damages for loss of income. Triay contends that the issue before the jury was simply whether or not her injury rendered her unable to work and that introduction of the family income was not relevant to the wage she was capable of earning after the accident. According to Triay, drawing profits from a successful business is not analogous to her ability to earn a wage, and that while the evidence indicates the business makes a considerable amount of money, such evidence prejudiced the jury *879 by showing that she makes large sums of money whether or not she works.
Generally, a district court is afforded great discretion concerning the admission of evidence at trial, and its decision to admit or exclude evidence may not be reversed on appeal in the absence of an abuse of that discretion.[1]
To support a claim for loss of earning capacity, a plaintiff need not show a loss of income as compared to his pre-accident income. However, he must show, by a preponderance of the evidence, that his ability to earn a living is impaired. We recognize that loss of earning capacity may be awarded to a plaintiff if the injury has deprived him of a capacity he would have been entitled to enjoy even though he never profited from it monetarily...
Before a plaintiff can recover for loss of future earning capacity, he must prove the loss, not with mathematical certainty, but with reasonable certainty. Future loss of earnings is inherently speculative, and must be proved with a reasonable degree of certainty; purely conjectural or uncertain future loss earnings will not be allowed.[2]
Although on appeal Triay characterizes Printers as her husband's business, and the now-defunct Crescent as hers, it is clear from the tax returns that these are family-owned businesses in which Triay is not simply a wage earner, but from which she derives income. Jimmy Triay testified that his wife is still part of the business. We find, therefore, that the trial court properly admitted the economic evidence. We further find that, although Triay showed a decline in the amount of time that she spends in the business, she failed to prove, by a preponderance of the evidence, that she was not able to perform the bookkeeping, and did in fact continue to write most of the checks.
Further, Triay's economist did not consider the various methods of directing income through the corporations, but merely considered her earning capacity as an employee. Finally, the evidence showed that Triay earned more in wages in the year 2002 than she had previously made. For these reasons, we are unable to conclude that the evidence complained of prejudiced the jury's award.
Triay next contends that the court erred in failing to instruct the jury not to consider Jimmy Triay's income or the profits earned by Printers in determining Triay's lost income claim. Because we have determined that this evidence was properly admitted, this assignment of error is without merit.
Triay also urges that the introduction of home videos depicting her enjoying herself at family activities confused and misled the jury. The admission of these videos was not objected to at trial. The failure to object to the admission of such evidence precludes Triay from raising this issue on appeal. LSA-C.E. art. 103.
In her next assignment of error, Triay urges that the jury based its verdict on "false testimony" by the defense expert, Dr. William Martin. She urges that Dr. Martin testified there was no objective evidence of a physical injury to her. Specifically, she states Dr. Martin testified on three occasions that, after the accident, there was no fluid in her nasal cavity, *880 which fluid is an indicator of a fractured skull. Triay contends that there were reports in evidence indicating that such fluid was present. In the exhibits were reports from Dr. Johnston and a CT scan that noted "apparent fluid within the right side of the sphenoid sinus." However, Dr. Johnston testified there was no leakage of fluid from Triay's nose, as did Dr. Roberts. Dr. Martin's testimony on this issue was not false. Additionally, Triay has failed to show how such testimony may have adversely influenced the jury. This assignment of error is without merit.
Finally, Triay urges that the damage award is inadequate in light of the evidence presented. The assessment of "quantum," or the appropriate amount of damages, by a jury is a determination of fact that is entitled to great deference on review.[3]
[I]t is only after articulated analysis of the facts discloses an abuse of discretion, that the award may on appellate review be considered either excessive or insufficient. Appellate courts review the evidence in the light which most favorably supports the judgment to determine whether the trier of fact was clearly wrong in its conclusions. Before an appellate court can disturb the quantum of an award, the record must clearly reveal that the jury abused its discretion. In order to make this determination, the reviewing court looks first to the individual circumstances of the injured plaintiff.[4]
General damages do not have a common denominator and must be decided on a case-by-case basis.[5] General damages include physical pain and suffering, inconvenience, loss of physical enjoyment, and other factors that affect the victim's life. Factors to be considered when assessing quantum for pain and suffering are severity and duration.[6]
In the present case, before the accident Triay apparently had a vibrant lifestyle and was successful in her business dealings. In the accident, she suffered a basilar skull fracture and a mild to moderate concussion. Following her initial hospitalization, Triay suffered headaches, dizziness, and loss of balance, partial loss of peripheral vision, and partial hearing loss. She also experiences intermittent shoulder and neck pain. She suffers from post-concussion syndrome, and post-traumatic stress disorder.
The mental and emotional components of the injury have clearly affected Triay. The medical testimony established several cognitive deficits related to the subject accident, including short-term memory loss. There was uncontradicted testimony that her personality had changed, that she is subject to anxiety and panic attacks, nightmares, and most significantly, depression. She has lost interest in a physical relationship with her husband and the testimony establishes that the level of interaction with her family has markedly decreased.
All physicians testified that Triay was not malingering, and that she tended to minimize her problems. Dr. Dietze was the only physician who testified as to physical and psychological impairment, giving *881 her ten percent impairment for anxiety, depression, and mood disturbances; ten percent for the traumatic brain injury, including a memory deficit; and five percent whole body impairment.
On the other hand, evidence showed that, while Triay has difficulty doing her former bookkeeping, she is still able to perform the vast majority of that work. She is still capable of enjoying life with her family, as evidenced by the video clips viewed by the jury. Further, there is testimony that most of her psychological symptoms may be alleviated by treatment for depression and proper medication.
An appellate court should increase or decrease an award only when the amount is beyond that which a reasonable trier of fact could assess for a particular injury upon the particular plaintiff under the circumstances of the case.[7] Although we find the award to be rather low, we cannot say that it is abusively so, that is, below that which a reasonable trier of fact could have assessed in these circumstances. A reviewing court might well disagree with the amount of the award fixed by the jury, but it is not entitled to substitute its opinion for that of the trier of fact.[8]
For these reasons, the verdict and judgment are affirmed. Triay is cast with all costs of appeal.
AFFIRMED.
NOTES
[1] Medine v. Roniger, XXXX-XXXX (La.7/2/04), 879 So.2d 706.
[2] Branan v. Allstate Ins. Co., 99-1209 (La. App. 5 Cir. 4/25/00), 761 So.2d 612, 616 (citations omitted). See also, Aguillard v. Meiners, 03-311 (La.App. 5 Cir. 9/16/03), 857 So.2d 1034, writ denied, 2003-2891 (La.1/9/04), 862 So.2d 987
[3] Trunk v. Medical Center of Louisiana at New Orleans, XXXX-XXXX (La.10/19/04), 885 So.2d 534.
[4] Baudier v. Cheron, 04-5 (La.App. 5 Cir. 5/26/04), 876 So.2d 165 (citing Theriot v. Allstate, 625 So.2d 1337 (La.1993)).
[5] Coscino v. Wolfley, 96-0702 (La.App. 4 Cir. 6/4/97), 696 So.2d 257, writ denied, 97-C-2317 (La.1/9/98), 705 So.2d 1100, and writ denied, 97-2539 (La.1/9/98), 705 So.2d 1102.
[6] Id.
[7] Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, sub nom., 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
[8] Griffin v. K-Mart Corp., 00-1334 (La.App. 5 Cir. 11/28/00), 776 So.2d 1226.