# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 10-0757 CONSOLIDATED WITH 10-0758


**HENRY ADAM BALTAZAR, ET AL.**

**VERSUS**

**DENNIS R. WOLINSKI, ET AL.**


************

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF ST. MARTIN, NO. 71088 "A"
HONORABLE GERALD B. WATTIGNY, DISTRICT JUDGE

************

**JIMMIE C. PETERS**
**JUDGE**

************

Court composed of Jimmie C. Peters, James T. Genovese, and David E. Chatelain,[*]
Judges.


**AMENDED IN PART, AFFIRMED IN PART,**
**REVERSED IN PART, AND RENDERED.**


**Charles Benjamin Landry**
**C. Benjamin Landry, APLC**
**1309 Lafayette Street**
**Lafayette, LA 70501**
**(337) 232-9806**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
    **Henry Adam Baltazar**

---

[*]Honorable David E. Chatelain participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.

**John W. Penny, Jr.**
**Penny & Hardy**
**600 Jefferson Street**
**P. O. Box 2187**
**Lafayette, LA 70502-2187**
**(337) 231-1955**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
    **Dennis R. Wolinski**
    **Kirkpatrick Industrial Supply, Incorporated**
    **Continental Casualty Company**

**William H. Eckert**
**Rhonda J. Thomas**
**Robin L. Jones**
**Ungarino & Eckert, L.L.C.**
**3850 North Causeway Blvd., Suite 1280**
**Metairie, LA 70002**
**(504) 836-7556**
**COUNSEL FOR INTERVENOR/APPELLEE:**
    **United States Fire Insurance Company**

PETERS, J.

The plaintiff in this automobile accident litigation, Henry Adam Baltazar, appeals a jury's quantum award as well as the trial court's judgment with regard to his employer's workers' compensation insurer's intervention action. For the following reasons, we amend in part, affirm in part, reverse in part, and render judgment.

## DISCUSSION OF THE RECORD

This litigation arises from an October 2, 2005 vehicular accident on the Interstate 10 Atchafalaya Basin Bridge in St. Martin Parish, Louisiana. The accident occurred when a tractor-trailer rig driven by Dennis Wolinski struck the rear of a tractor-trailer rig driven by Mr. Baltazar and pushed Mr. Baltazar's rig forward into the rear of another vehicle. At the time of the accident, Mr. Wolinski was operating his rig in the course and scope of his employment with Kirkpatrick Industrial Supply, Inc., and Mr. Baltazar was operating his vehicle in the course and scope of his employment with SNL Distribution. United States Fire Insurance Company provided workers' compensation coverage to SNL Distribution.

Mr. Baltazar brought suit to recover the damages he sustained, naming a number of parties as defendants,[1] including Mr. Wolinski, Kirkpatrick Industrial Supply, and its liability insurer, Continental Casualty Company (hereinafter sometimes referred to collectively as "the defendants"). United States Fire Insurance Company (United States Fire) intervened in Mr. Baltazar's action, seeking reimbursement of all workers' compensation benefits paid to him, or paid on his behalf, as a result of the accident.

---

[1]Additionally, loss of consortium claims were filed on behalf of Mr. Baltazar's two minor children. However, neither the other defendants nor the loss of consortium claims are a part of this appeal.

On September 21, 2009, at the beginning of the five-day jury trial, the litigants stipulated that the workers' compensation intervention would not be mentioned to the jury and that the determination of the amounts owed the intervener would be deferred to a later day. Additionally, because liability was not a serious issue, the jury trial proceeded to determine the extent and duration of Mr. Baltazar's injuries. After completion of the evidentiary phase of the trial, the jury returned its verdict, awarding Mr. Baltazar the following amounts in damages:

| | | |
|---|---|---|
| A. | Past, present and future physical pain and suffering | $17,000.00 |
| B. | Past, present and future mental pain and suffering | $25,000.00 |
| C. | Past medical expenses | $75,000.00 |
| D. | Future medical expenses | $5,000.00 |
| E. | Permanent injury or disability | $0.00 |
| F. | Loss of enjoyment of life | $5,000.00 |
| G. | Past lost wages and employment benefits | $20,000.00 |
| H. | Future lost wages and employment benefits | $0.00 |

On October 19, 2009, the trial court signed a final judgment incorporating the jury's verdict. After the trial court rejected Mr. Baltazar's motion for a judgment notwithstanding the verdict and motion for new trial, the trial court granted Mr. Baltazar's motion to appeal the October 19, 2009 judgment by an order executed on November 23, 2009. On January 20, 2010, the trial court executed a final judgment awarding United States Fire two-thirds of the jury award, or $98,000.00, and awarding the remaining $49,000.00 to Mr. Baltazar's attorney for his attorney fees and costs of the litigation. Mr. Baltazar timely appealed this judgment as well. Both appeals have been consolidated and are now before us in the form of three assignments of error:

1. The trier of fact committed manifest error in awarding the Petitioner damages which were either unreasonably low or below the lowest award a reasonable trier of fact should award considering the injuries suffered by Petitioner-Appellant, his

permant disabilities, his past and future wage losses, and his clear loss of earning capacity.

2.	The trial court erred in granting a money judgment to the Intervenor in the amount of $98,000.00 on the Petition for Intervention where the Intervenor introduced no evidence and testimony of compensation actually paid by it or Petitioner-Appellant's employer.

3.	Alternatively, the trial Court erred in its interpretation of La.R.S. 23:1103 as it pertains to the employer and employee or his dependent, as it pertains to judgments obtained by an attorney at law pursuant to La.R.S. 9:5001, resulting in an unconstitutional taking. Additionally, there is a conflict in the Third Circuit cases, which interpret La.R.S. 23:1103 as applied to La.R.S. 9:5001.

## OPINION

### *Assignment of Error Number One*

The first assignment of error raised by Mr. Baltazar addresses the sufficiency of the quantum awards for past, present, and future pain and suffering; permanent injury or disability; past lost wages and employment benefits; and future lost wages and unemployment benefits. He argues that these awards are unreasonably low and should be increased to the lowest award a reasonable trier of fact could have awarded. The disposition of this assignment of error is based primarily on an evaluation of the medical evidence presented at trial.

The evidentiary record establishes that Mr. Baltazar sought medical treatment immediately after the accident at the emergency room of Lady of Lourdes Regional Medical Center in Lafayette, Louisiana, and was treated and released. His primary complaints at this time were that of blurred and double vision and a fractured nose. After being examined by the emergency room doctor and subjected to a CAT scan, he was released to go home.

3

Mr. Baltazar began treatment with Dr. Keith Mack, a Lafayette, Louisiana general practitioner, three days after the accident, from October 5, 2005, through February 3, 2006. Dr. Mack recommended conservative care, medication, physical therapy, and x-rays, and referred Mr. Baltazar to specialists for treatment of the nasal fracture and his eye problems.

On October 11, 2005, Dr. C. Barrett Alldredge, a Lafayette, Louisiana surgeon, performed surgery to repair Mr. Baltazar's fractured nose. Dr. Alldredge discharged Mr. Baltazar, noting on December 15, 2005, that he had no permanent problems or disability resulting from his nose injury or surgery.

On November 8, 2005, Dr. Cheryl Neu, an opthamologist, examined Mr. Baltazar. She concluded that an eye inflammation was probably causing his light sensitivity and headaches, and she prescribed steroid drops to treat the inflammation. Ten days later, on November 18, 2005, Dr. Neu discharged Mr. Baltazar from her care, stating that there would be no long-term complications or disabilities resulting from his eye problems.

Mr. Baltazar's primary physician for the treatment of the remainder of his injuries was Dr. Leo A. deAlvare, a Lafayette, Louisiana neurologist who first saw him on January 24, 2006, or almost four months after the accident. On this initial visit, Mr. Baltazar related a history of bleeding from the nose and forehead, dizziness, and confusion immediately after the accident, but he denied losing consciousness. He informed Dr. deAlvare that the night after the accident he was agitated and confused and vomited several times. According to Mr. Baltazar, in the first two weeks after the accident, he stayed confused, often got lost, and suffered severe pain. He complained that at the time of the January 24, 2006 visit, he was suffering from intermittent

4

headaches, neck and low back pain, swelling on the bridge of his nose, and clicking and pain when opening and closing his jaw.

After recording the history given and examining his patient, Dr. deAlvare concluded that, in addition to his broken nose, Mr. Baltazar had suffered a closed head injury with a mild concussion, which had already resolved itself; a temporomandibular joint (TMJ) injury; a flexion-extension injury (whiplash) resulting in an ongoing cervical myofascial syndrome; and a bilateral sacroiliac joint injury. He attributed Mr. Baltazar's headache complaints to the TMJ injury, attributed his neck pain complaints to the whiplash injury, and concluded that the ongoing cervical myofascial syndrome was exacerbated by the TMJ dysfunction. Dr. deAlvare also noted that Mr. Baltazar manifested some depressive symptomology, which he suggested was possibly related to the closed head injury but more probably related to an adjustment disorder and sleep disturbance, both of which were probably related to chronic pain syndrome. The doctor related all of his findings to the accident at issue in this litigation.

Dr. deAlvare prescribed medication for Mr. Baltazar's depression, pain, and inflammation and to aid in his sleeping difficulties. He also referred Mr. Baltazar to a physical therapist for assistance with the pelvis and cervical spine complaints and to Dr. James A. Pearce, a Lafayette, Louisiana general dentist who specializes in the treatment of TMJ, for treatment of the TMJ disorder. Dr. deAlvare continued to treat Mr. Baltazar and saw him for the last time in April of 2009, or approximately five months before the trial on the merits began.

Pursuant to Dr. deAlvare's recommendation, Dr. Pearce treated Mr. Baltazar beginning February 23, 2006, for TMJ. Dr. Pearce diagnosed Mr. Baltazar with TMJ capsulitis and myofascial pain of the muscles of mastication on the left side of his face

5

and head. Dr. Pearce treated Mr. Baltazar's condition with splint therapy and concluded that he had reached his maximum medical improvement on November 28, 2006.

When Dr. deAlvare saw Mr. Baltazar the second time, on March 16, 2006, he noted that the prescribed physical therapy had helped tremendously with his patient's lower back complaints, but that Mr. Baltazar was still having discomfort in his neck and continuing to suffer headaches every two to three days. The results of an MRI of the cervical spine were unremarkable, but Mr. Baltazar suffered pain when looking straight up. Dr. deAlvare continued Mr. Baltazar on the prescription medication and physical therapy. The only reason that Mr. Baltazar was not cleared to return to work at this time was due to his neck pain.

By May 9, 2006, when Mr. Baltazar returned to Dr. deAlvare, his lower back had improved, he was sleeping well, and his depression was under control. His primary complaints at that time related to his continued neck pain and headaches. Dr. deAlvare began treating Mr. Baltazar with cervical epidural steroid injections for the pain. When Mr. Baltazar returned to the doctor on August 17, 2006, his back was at eighty-five percent improvement, with occasional discomfort but no severe pain; and the frequency of the headaches was down to only one per week. The steroid injections were effective, but the positive effect, according to Mr. Baltazar, lasted only one week. At this time, Dr. deAlvare recommended two more steroid injections.

The November 21, 2006 office visit resulted in the doctor recommending more steroid injections. However, by the February 22, 2007 examination, Mr. Baltazar's headache complaints had increased. Dr. deAlvare concluded that the increase in

6

headaches was related to the side effects of the splint therapy associated with the TMJ treatment.

On April 26, 2007, Dr. deAlvare found Mr. Baltazar to be depressed and anxious to go back to work. Dr. deAlvare sent Mr. Baltazar for a functional capacity evaluation (FCE). The results of the FCE performed on June 11 and 12, 2007, revealed that, despite Mr. Baltazar's maximum effort during the evaluation, his neck and upper thoracic pain limited his ability to do elevated work. Additionally, the test results suggested that his back pain limited his forward bending and sitting, kneeling, and standing for more than twenty minutes.

Despite the negative results of the FCE, at a July 30, 2007 office visit, Dr. deAlvare suggested that Mr. Baltazar attempt a thirty-day work trial with restrictions: no flexing forwarding, no lifting in that position greater than twenty pounds, and no overhead work at all. However, Mr. Baltazar did not return to work, explaining to Dr. deAlvare at a June 12, 2008 office visit that he could find no light-duty employment.

At a January 8, 2009 office visit, Dr. deAlvare found that Mr. Baltazar was still exhibiting objective evidence of spasms in his neck, and on the last time he saw Mr. Baltazar, in April of 2009, Dr. deAlvare had concluded that his patient was approaching maximum medical improvement. In his testimony, Dr. deAlvare stated that Mr. Baltazar had permanent American Medical Association anatomical impairment ratings of ten percent for his neck and ten percent for his lower back. Dr. deAlvare testified that the FCE rating was also permanent. With regard to future medical care, Dr. deAlvare testified that Mr. Baltazar would need maintenance-type medical treatments for the future; specifically one to three visits with him a year, plus

four weeks of physical therapy a year, and approximately $300.00 worth of medications for pain, depression, and sleeplessness each month.

While undergoing treatment from Dr. deAlvare, Mr. Baltazar also performed physical therapy from January 25, 2007, through April 5, 2007, with Roxanne H. Touchet at the McLeod-Trahan-Sheffield Physical Therapy Services in Lafayette, Louisiana. In her reports, Ms. Touchet stated that Mr. Baltazar had regularly attended his ten physical therapy sessions and had progressed well. At the April 5, 2007 session, Ms. Touchet reported that Mr. Baltazar was able to lift seventy-five pounds from the floor to his waist and overhead safely and that Mr. Baltazar felt able to return to work.

Glen Hebert, a Lafayette, Louisiana, vocational rehabilitation counselor, met with Mr. Baltazar on July 10, 2007.[2] According to Mr. Hebert, on that day, Mr. Baltazar could lift seventy-five pounds, but could only maneuver twenty pounds. He explained that heavy work requires lifting over fifty pounds throughout the day and moving ten to twenty pounds continuously and that at that time Mr. Baltazar was not employable as a heavy-duty truck driver because of his lifting restrictions. Additionally, although Mr. Hebert believed Mr. Baltazar was capable of driving a school bus or short truck on short trips, he was of the opinion that Mr. Baltazar should not be driving an eighteen-wheeler truck because of his anxiety and depression. Mr. Hebert testified that before the accident, Mr. Baltazar could earn $44,605.00 to $56,770.00, while now, after the accident, his earning potential is restricted to $15,000.00 to $16,000.00.

---

[2]Mr. Hebert testified that he met with Mr. Baltazar only once because he understood that Mr. Baltazar was using another vocational rehabilitation expert to find employment.

Dr. Susan R. Andrews, a Metairie, Louisiana clinical neuropsychologist, saw Mr. Baltazar on August 13 and 14, 2007, or almost two years after the accident. The purpose of her examination and evaluation was to assist Mr. Baltazar with rehabilitation so that he could return to work. Based on the history provided her and her examination and testing results, Dr. Andrews concluded that Mr. Baltazar sustained a mild traumatic brain injury in the accident and this resulted in a post-concussion syndrome difficulty. She suggested that Mr. Baltazar suffered from an anxiety disorder, depression, a cognitive disorder, and a personality change due to the head injury. Dr. Andrews testified that Mr. Baltazar had frontal lobe problems, which affected his attention and his verbal memory, as well as right posterior involvement, resulting in reduced fine motor coordination and a loss of spatial orientation. She found him to be very honest on the testing. Dr. Andrews testified that the brain does heal itself over time, but she recommended cognitive rehabilitation for Mr. Baltazar.

Dr. deAlvare referred Mr. Baltazar to Dr. David J. Barczyk, a Lafayette, Louisiana chiropractic physician, who first saw Mr. Baltazar on September 12, 2008. Dr. Barczyk treated Mr. Baltazar for low back pain, neck pain, and headaches until May of 2009. According to Dr. Barczyk, Mr. Baltazar had a restricted range of motion in his cervical spine and a lumbar strain, with muscle spasms and that his prognosis was not good. While Dr. Barczyk was able to provide Mr. Baltazar with some relief through treatment, he could provide no sustained relief.

The medical evidence introduced by Mr. Baltazar reflects that he sustained a number of injuries in the October 2, 2005 accident, with full recovery in most cases. His fractured nose was repaired by surgery, and Dr. Alldredge released him without any residuals on December 15, 2005, or slightly over two months after the accident.

Dr. Neu treated Mr. Baltazar for an eye inflammation that contributed to his light sensitivity and headaches and released him on November 18, 2005, or one and one-half months after the accident. Dr. Pearce treated Mr. Baltazar for a TMJ injury and released him as having reached maximum medical improvement on November 28, 2006, or slightly less than one year and two months after the accident. Dr. deAlvare treated Mr. Baltazar over a period of over forty months for a number of complaints. His final conclusion was that Mr. Baltazar was still suffering from depression and anxiety forty months post-accident and that he suffered from a permanent anatomical impairment rating of ten percent in the neck and ten percent in the lower back. According to Dr. deAlvare, Mr. Baltazar would be unable to return to work at his former occupation and would require maintenance-type medical treatment for the remainder of his life. Dr. deAlvare's final diagnosis and prognosis is supported by the testimony of Mr. Hebert, Dr. Barczyk, and Dr. Andrews.

Dr. Walter Stanley Foster, a Lafayette, Louisiana orthopaedic surgeon, saw Mr. Baltazar professionally on May 21, 2008. According to Dr. Foster, Mr. Baltazar's neck examination was objectively normal at the time, and he was of the opinion that Mr. Baltazar was capable of driving a tractor-trailer rig. He based this conclusion on the April 2007 physical therapy report that stated Mr. Baltazar could lift seventy-five pounds from the floor to his waist and then overhead, as well as the June 2007 FCE which suggested Mr. Baltazar could perform heavy lifting with limitations on flexion and overhead work. In Dr. Foster's opinion, Mr. Baltazar should have fully recovered from his injuries in three to six months after the accident, and there was no orthopedic reason that, as of April or June of 2007, Mr. Baltazar could not work as a tractor-trailer truck driver.

Dr. Kevin J. Bianchini, a Metairie, Louisiana neuro and clinical psychologist, evaluated Mr. Baltazar on March 24 and 25, 2008. Based on his evaluation and his review of the medical and physical therapy records associated with Mr. Baltazar's treatment, Dr. Bianchini concluded that Mr. Baltazar had suffered a mild, uncomplicated concussion, with no permanent damage. While he suggested that such a concussion should resolve itself within one to three months, it could take as much as one year for full recovery. In his opinion Mr. Baltazar did have depressive symptoms, but they did not arise from damages suffered from the accident, but from other life factors. Although he did not believe Mr. Baltazar to be a malingerer, Dr. Bianchini was of the opinion that Mr. Baltazar was psychologically and cognitively capable of returning to work.

Dr. Rennie W. Culver, a Metairie, Louisiana, psychiatrist, interviewed and evaluated Mr. Baltazar on February 25, 2008. Based on this approximately three-hour interview and examination, Dr. Culver concluded that Mr. Baltazar was, in fact, a malingerer, finding that Mr. Baltazar's claims to have trouble with his long-term memory were inconsistent with the nature of the medical problems.

Burt Ashman, of Lafayette, Louisiana, was accepted at trial as an expert in vocational rehabilitation. Mr. Ashman performed a vocational evaluation of Mr. Baltazar on September 4, 2009. He testified that Mr. Baltazar had not suffered any loss of earning capacity as a result of the accident. Mr. Ashman based this conclusion on Dr. deAlvare's August 6, 2007 decision to return Mr. Baltazar to work with restrictions and the reports from Dr. Bianchini, Dr. Foster, and Ms. Touchet.

Thus, the medical evidence favorable to the defendants was primarily derived from the testimony of three physicians who examined or evaluated Mr. Baltazar on

11

one occasion each, and two and one-half years after the accident. Additionally, the one vocational expert testifying for the defendants based his conclusion that the defendant suffered no loss of earning capacity as a result of the accident based on the reports of the defense doctors and Dr. deAlvare's attempt to return Mr. Baltazar back to work with restrictions in August of 2007.

It is obvious from the damage awards that the jury concluded that Mr. Baltazar sustained significant injuries in the accident, and that he will require medical treatment in the future. However, it is equally obvious that the jury verdict is a rejection of Mr. Baltazar's assertion that he sustained a permanent disability or that he suffered a loss of income in the future. On appeal, Mr. Baltazar questions the sufficiency of only the general damage award for physical pain and suffering and the special damage award for lost income prior to trial. Additionally, he argues that it was error for the jury to award nothing in general damages for the permanent disability testified to by Dr. deAlvare and nothing in special damages for his future loss of income.

### *General Damages*

In considering whether an award of general damages is excessive or inadequate, we are guided by the decision in *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257, 1261 (La.1993), *cert. denied*, 510 U.S. 1114, 114 S.Ct. 1059 (1994), wherein our supreme court noted that "the discretion vested in the trier of fact is 'great,' and even vast, so that an appellate court should rarely disturb an award of general damages." Under *Youn*, "[t]he initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the 'much discretion' of the trier of fact." *Id*. at 1260. Only after the initial inquiry is answered in the affirmative should the appellate court increase or

reduce the award. *Id.* In making the initial inquiry, the reviewing court should not use "a scale of prior awards in cases with generically similar medical injuries to determine whether the particular trier of fact abused its discretion in the awards to the particular plaintiff under the facts and circumstances peculiar to the particular case." *Id.* at 1260. Such prior awards should be considered only after the reviewing court concludes that there has been an abuse of discretion. *Id.*

In deciding not to award Mr. Baltazar any damages for permanent injury or disability, the jury apparently disregarded Dr. deAlvare's testimony that Mr. Baltazar had permanent American Medical Association anatomical impairment ratings of ten percent for his neck and ten percent for his lower back, instead choosing to believe Dr. Foster's testimony that Mr. Baltazar had no objective symptoms of permanent injury. "[W]here there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable." *Rosell v. ESCO*, 549 So.2d 840, 844 (La.1989). Accordingly, while we may well have reached a different verdict, following the supreme court's guidance set forth in *Youn* we will not disturb the jury's decision on the question of damages for permanent injury or disability.

However, the jury's decision to award Mr. Baltazar only $17,000.00 for past, present, and future physical pain and suffering was an abuse of discretion. As a result of this accident Mr. Baltazar suffered a mild concussion, a broken nose, TMJ, eye injuries, headaches, and whiplash that affected his neck and back. He underwent surgery to repair the broken nose, splint therapy for the TMJ, and physical therapy and epidural shots for his back and neck injuries. His treating physician testified that he

13

did not reach maximum medical improvement for his back and neck injuries until April of 2009. Given the extensive nature of his injuries, as well as the painful procedures necessary to recover from them, we find that the jury's award of $17,000.00 for past, present, and future physical pain and suffering was abusively low.

The supreme court has held that when a jury's award for damages is excessively low, even when the jury awards no damages for a particular item, this court can only increase the award "to the lowest amount which is reasonably within the court's discretion." *Ryan v. Zurich Am. Ins. Co.*, 07-2312, p. 7 (La. 7/1/08), 988 So.2d 214, 219. Accordingly, we will raise Mr. Baltazar's award for physical pain and suffering to the lowest point that was reasonably within the discretion of the trier of fact. *Youn*, 623 So.2d 1257. In adjusting the award, we refer to prior awards in similar cases to determine the lowest point of an award within that discretion. *Coco v. Winston Indus., Inc.*, 341 So.2d 332 (La.1976).

In *Winstead v. Watson*, 19,641 (La.App. 2 Cir. 05/04/88), 528 So.2d 691, the second circuit found that the lowest amount the trial court could have awarded to the plaintiff for a fractured jaw, memory loss, and a concussion was $10,000.00. The fifth circuit affirmed an award of $95,832.00 for past and future physical injuries, pain, and suffering to a plaintiff who suffered a basilar skull fracture, with a mild to moderate concussion, followed by headaches, dizziness, and loss of balance, partial loss of peripheral vision, a partial hearing loss, intermittent shoulder and neck pain, post-concussion syndrome, and post-traumatic stress disorder. *Burgard v. Allstate Ins. Co.*, 04-1394 (La.App. 5 Cir. 5/31/05), 904 So.2d 867, *writ denied*, 05-1743 (La. 1/13/06), 920 So.2d 240. In *Williams v. Aymond*, 05-1547 (La.App. 3 Cir. 12/6/06), 945 So.2d 823, *writ denied*, 07-5, (La. 3/9/07), 949 So.2d 442, *writ denied*, 07-69 (La.

14

3/9/07), 949 So.2d 449, and *overruled in part on other grounds*, *Hebert v. Webre*, 07-95 (La.App. 3 Cir. 12/5/07), 971 So.2d 1238, this court affirmed an award of $44,500.00 in general damages when the plaintiff suffered from a deviated septum, neck and back spasms, headaches, and nose bleeds for over a year. After reviewing these awards, and the evidence presented at trial, we conclude that the lowest amount the jury could have awarded to Mr. Baltazar for his past, present, and future physical pain and suffering is $30,000.00. Accordingly, we amend the trial court's judgment of October 19, 2009, to reflect this increased award.

### *Special Damages*

Special damages, such as lost wages, are those which can be fixed with pecuniary certitude. *Am. Druggists Ins. Co. v. Henry Contracting, Inc.*, 505 So.2d 734 (La.App. 3 Cir.), *writ denied*, 511 So.2d 1156 (La.1987). "An appellate court, in reviewing a jury's factual conclusions with regard to special damages, must satisfy a two-step process based on the record as a whole: there must be no reasonable factual basis for the trial court's conclusions, and the finding must be clearly wrong." *Guillory v. Lee*, 09-75, p. 16 (La. 6/26/09), 16 So.3d 1104, 1118.

Mr. Baltazar first contends that the jury's award of $20,000.00 in special damages for past lost wages and employment benefits is abusively low. The plaintiff has the burden of proving past lost wages and time missed from work due to his injury. *Stark v. Nat'l Tea Co.*, 94-2633 (La.App. 4 Cir. 5/16/95), 655 So.2d 769, *writ denied*, 95-1801 (La. 11/3/95), 661 So.2d 1380; *Daigle v. U.S. Fid. & Guar. Ins. Co.*, 94-304 (La.App. 1 Cir. 5/5/95), 655 So.2d 431. Past lost wages are susceptible of mathematical calculation, and the award is not subject to the much discretion rule. *Stark,* 655 So.2d 769; *Daigle*, 655 So.2d 431.

15

Our review of the record shows that there is no reasonable basis for the jury's finding that Mr. Baltazar's past lost wages and employment benefits amounted to only $20,000.00. The accident took place on October 2, 2005. Mr. Baltazar's treating physician, Dr. deAlvare, did not release Mr. Baltazar to return to work until July 30, 2007, and then only with restrictions. That is to say, Mr. Baltazar was not released to work until twenty-two months after the accident. Although Dr. Foster testified that Mr. Baltazar "should" have recovered from his injuries within three to six months after the accident, Dr. Foster did not examine Mr. Baltazar until May 21, 2008. Further, Dr. Foster testified that there was no orthopedic reason that Mr. Baltazar could not have returned to work as of April or June of *2007*, still eighteen months after the accident. Thus, in the record before us there is no basis for any finding other than that Mr. Baltazar was unable to work for at least eighteen months after the accident. The only evidence concerning the value of Mr. Baltazar's past lost wages and employment benefits was provided by Dr. R. Douglas Womack, a Lafayette, Louisiana consulting economist, who stated in his report that the value of Mr. Baltazar's lost earnings and lost employer-paid insurance benefits from the date of the accident until September 21, 2009 – 3.97 years – totaled $132,672.00. Using these values, the only ones provided at trial, Mr. Baltazar's lost earnings and lost employer-paid insurance benefits for the eighteen months after the accident equaled $50,127.96. We find that, given this evidence, the jury's award of $20,000.00 for past lost wages and employment benefits was clearly wrong, and accordingly increase this award to $50,127.96.

Mr. Baltazar also contends that the jury erred in refusing to award him future lost wages and employment benefits. We explained loss of earning capacity in *Batiste*

16

*v. New Hampshire Ins. Co*, 94-1467, p. 3-4 (La.App. 3 Cir. 5/3/95), 657 So.2d 168, 170, *writ denied*, 95-1413 (La. 9/22/95), 660 So.2d 472 (citations omitted):

> Loss of earning capacity is not the same as lost wages. Rather, earning capacity refers to a person's potential. Earning capacity is not necessarily determined by actual loss. While the plaintiff's earnings at the time of the accident may be relevant, such figures are not necessarily indicative of his past or future lost earning capacity. The plaintiff need not be working or even in a certain profession to recover this type of award. What is being compensated is the plaintiff's lost ability to earn a certain amount, and he may recover such damages even though he may never have seen fit to take advantage of that capacity.

> In determining whether a personal injury plaintiff is entitled to recover for the loss of earning capacity, the trial court should consider whether and how much plaintiff's current condition disadvantages him in the work force. The trial court should thus ask itself what plaintiff might be able to have earned but for his injuries and what he may now earn given his resulting condition.

> The very nature of lost earning capacity makes it impossible to measure the loss with any kind of mathematical certainty. The facts of each case must take into account a variety of factors, including the plaintiff's condition prior to the accident, his work record prior to and after the accident, his previous earnings, the likelihood of his ability to earn a certain amount but for the accident, the amount of work life remaining, inflation, and the plaintiff's employment opportunities before and after the accident.

In deciding not to award Mr. Baltazar any future lost wages or employment benefits, the jury apparently concluded that as of the date of trial, Mr. Baltazar's earning capacity was no longer impaired. Based on our review of the record, we cannot conclude that there was no reasonable factual basis for the jury's conclusion on this element of damages, or that its finding was clearly wrong.

### Assignment of Error Number Two

In this assignment of error, Mr. Baltazar asserts that the trial court erred in awarding United States Fire a judgment on its intervention. Specifically, Mr. Baltazar points to the evidentiary record, which contains no evidence to establish any payments

17

by United States Fire, much less the amount awarded. United States Fire does not dispute the fact that it failed to introduce any evidence at the December 18, 2009 hearing to establish the amount of workers' compensation benefits it paid directly to Mr. Baltazar or on his behalf. Instead, it argues that prior to the hearing Mr. Baltazar's trial counsel had stipulated to the amount paid.

Our supreme court has stated that "a plaintiff's stipulation has the effect of a judicial admission or confession and binds all parties and the court." *Miller v. LAMMICO*, 07-1352, pp. 23-24 (La. 1/16/08), 973 So.2d 693, 709. Louisiana Civil Code Article 1853 provides that "[a] judicial confession is a declaration made by a party in a judicial proceeding. That confession constitutes full poof against the party who made it. A judicial confession is indivisible and it may be revoked only on the ground of error of fact." This court has previously held that "[a] judicial confession must be explicit and not merely implied." *First Homestead Fed. Sav. and Loan Ass'n v. Coleman*, 446 So.2d 551, 553 (La.App. 3 Cir. 1984).

The record contains a number of references to the payment of workers' compensation benefits both leading up to trial on the merits, at the trial on the merits, and thereafter. After United States Fire filed its petition of intervention on September 29, 2006, Mr. Baltazar answered the petition on December 3, 2007, denying "for lack of sufficient information to justify belief therein" that the intervenor had paid him workers' compensation benefits. This denial requires that the intervenor prove the allegations of fact set forth in its petition. *First Homestead Fed. Sav. and Loan Ass'n*, 446 So.2d 551.

The first reference relied on by United States Fire to establish that a stipulation had been entered into is found in a twenty-six page document entitled "PRE-TRIAL

18

STIPULATION" filed[3] by counsel for Mr. Baltazar, purportedly on behalf of all counsel of record, on August 4, 2009.[4] While this filing clearly establishes that United States Fire paid workers' compensation benefits to Mr. Baltazar, it leaves the amount of those benefits as an element of proof at trial.

The language relied upon by United States Fire in the pretrial stipulation is found in the section entitled "**ESTABLISHED FACTS**" and reads as follows:

> Intervenor, UNITED STATE[sic] FIRE INSURANCE COMPANY states:
>
> Intervenor, United States Fire Insurance Company, has paid at least $160,292.36 in worker's [sic] compensation benefits to, or on behalf of, Adam Baltazar.

United States Fire asserts that this language should be construed to constitute a stipulation by Mr. Baltazar that the intervenor was owed at least $160,292.36. However, in making this argument, United States Fire ignores the references to its claim in the sections of the stipulation entitled "**CONTESTED ISSUES OF FACT**" and "**CONTESTED ISSUES OF LAW**," both of which reference its claim as contested. Additionally, under the section of the pretrial stipulation entitled "**EXHIBITS**," United States Fire asserted that it would introduce at trial the "[p]rintout of indemnity and medical benefits paid to, or on behalf of, Adam Baltazar." Also, under the "**WITNESSES**" section of the pretrial stipulation, the forty-sixth witness listed is "[a] representative of SNL, or Bobby Duhon" who would testify "to any and all employment records of Henry Adam Baltazar, any and all policies of

---

[3]Although filed in the record of the proceedings, the pretrial stipulation was never introduced into evidence at any of the many hearings held in conjunction with this litigation.

[4]The pretrial stipulation is signed by counsel for Mr. Baltazar but lists the names and addresses of all the counsel of record after his signature, including that of counsel for United States Fire.

19

insurance, and/or *workers' compensation benefits.*" (Emphasis added.) Finally, under one of the very last sections of the pretrial stipulation, which is entitled "**WORKMEN'S COMPENSATION INTERVENTION**," the following language appears:

> Plaintiff, HENRY ADAM BALTAZAR, individually and on behalf of his minor children, JALEEZ BALTAZAR and JALEEYA BALTAZAR, contends:
>
> The intervenor was the worker's [sic] compensation insurer of the Plaintiff's employer at the time of his alleged injuries which give rise to this lawsuit; that at such time the Plaintiff was in the course and scope of his employment; and that the intervenor has paid and perhaps is still paying compensation benefits and medical bills pursuant thereto. Further, *intervenor must prove all such amounts paid at trial.*

(Emphasis added.)

Thus, the document entitled "**PRETRIAL STIPULATION**" is less a stipulation and more a summary of the positions of the various parties. With regard to United States Fire's intervention, it acknowledges that some workers' compensation benefits were paid either directly to Mr. Baltazar or on his behalf, but the amount clearly remained an issue to be proven at trial. We find United States Fire's reliance on this document as support for its position to be misplaced.

We find no support for United States Fire's stipulation argument in the trial transcript either. Before the jury trial began on September 21, 2009, the litigants entered into a stipulation that relieved counsel for United States Fire from sitting through the entire jury trial. However, this stipulation did not relieve United States Fire of its obligation to prove the amount of its intervention by competent evidence. The stipulation that was entered into arose from the following exchange between the trial court and the various litigants:

20

| | |
|---|---|
| BY THE COURT: | I believe y'all have a stipulation or an agreement you want to put on the record about the intervenor. |
| COUNSEL FOR INTERVENOR: | Bill Eckert on behalf of the intervenor. I believe we have a stipulation and agreement of counsel that there will be an acknowledgment that the worker's [sic] comp lien exists, but that there will be no mention of worker's [sic] comp or worker's [sic] comp payments to the jury; and that the determination of the lien amounts would be deferred to a rule day post-trial. So that my presence here throughout the entire trial would not be necessary.<br><br>Is that what everyone else understands to be the case? |
| COUNSEL FOR DEFENDANTS: | I think that's the general discussion we had. |
| COUNSEL FOR INTERVENOR: | Any objections to that? |
| COUNSEL FOR PLAINTIFFS: | No objections. |
| BY THE COURT: | Okay. So that will be what'll be done. And you won't have to wait and attend the trial. And then when we have the rule day, whatever arguments y'all have about what is - what should be reimbursed and what shouldn't be reimbursed, we'll take up then. |
| COUNSEL FOR INTERVENOR: | And just for the record, I think we'll come close to an agreement as to what's related, what's not related. We've already started that discussion last week. So I think there may be a few thousand dollars here and there that the Court may have to rule upon. |
| COUNSEL FOR DEFENDANTS: | And just to protect the plaintiff and the defendant, we're agreeing that there is a lien, because it was in the course and scope; but the amount of what is recoverable, we may have some differences with the intervenor about. Right, Ben? |
| COUNSEL FOR PLAINTIFFS: | Right. And also the question of Moody fees and sharing of expenses as well. |

21

COUNSEL FOR INTERVENOR:    Correct.  That all will be deferred until a hearing.

We construe the discussion that occurred after the stipulation that United States Fire's counsel would not be required to sit through the jury trial as nothing more than a statement that negotiations were underway to determine the amount in dispute, but that no such agreement had been reached.  Nothing in this exchange suggests that the plaintiffs relieved the intervenor of proving up the amount of his claim.

On October 5, 2009, United States Fire filed a motion to "set intervention amounts for hearing."  In its motion, United States Fire acknowledged that the trial stipulation "acknowledged the existence of the lien subject to later determination and ruling from the court as to the intervention amount."

The intervention issues first came to trial on November 25, 2009,[5] but this hearing failed to address the issues because of the late filing of a memorandum by United States Fire.  With regard to the intervention issues, the following exchange took place:

COUNSEL FOR INTERVENOR:    Good morning, Judge.  May it please the Court?  Bill Eckert on behalf of intervenor, U.S. Fire.

Just from a point of reference, at the - on the morning of trial, we appeared and had a status conference with the Court and with counsel.  Essentially, there was an agreement.  I don't want to call it a stipulation, but we read into the record an understanding or agreement that my presence at trial was not going to take place for fear of influence, prejudicing the jury, what have you.  It was agreed that we would submit the cost of the intervention and the recovery of the intervention via post-trial

_____

[5]Certain issues involving court costs were addressed at this hearing as well.  However, that judgment had no effect on the intervention issue.

motions and memoranda, which is why we're here today, Judge.

We have submitted a motion and a memoranda. I apologize for the lateness of the memoranda. It was circulated, but not as soon as I would have liked.

Essentially, Judge, the worker's [sic] comp carrier paid approximately $164,000. The amounts - the actual amounts paid, I don't believe there's any dispute on those amounts paid. Where there may be any dispute is whether it's reasonable and/or an amount that is fully recoverable. But I believe we have a stipulation as to the amount. So we'll just have to then break it down into categories from that point forward.

BY THE COURT:
Well, let's see. [COUNSEL FOR PLAINTIFFS], you agree with the $164,000?

COUNSEL FOR PLAINTIFFS:
Judge, I just want to make sure that there's an amount of $11,000 that was litigation-related. I want to make sure that was removed.

COUNSEL FOR INTERVENOR:
I'm fairly certain, Judge, that that $11,000 payment which was part of the pending worker's [sic] comp 1008, that that has been taken away from the total amount, so that the amount is $164,000. I'm pretty sure.

COUNSEL FOR PLAINTIFFS:
Also, Judge –

BY THE COURT:
Well, let me ask you, [COUNSEL FOR PLAINTIFFS].

COUNSEL FOR PLAINTIFFS:
Yes, sir.

BY THE COURT:
Maybe this would be pertinent at this point. Since I only got this memorandum this morning, I'm assuming you only got it this morning.

COUNSEL FOR PLAINTIFFS:
Yes, sir.

BY THE COURT:
Have you had a chance to get prepared for this, or you want to have another hearing so you

23

|                              |                                                                                                                                                       |
| ---------------------------- | ----------------------------------------------------------------------------------------------------------------------------------------------------- |
|                              | can get adequately prepared about his memorandum?                                                                                                      |
| COUNSEL FOR PLAINTIFFS:       | I would prefer a little more time, Judge. I mean, we can go through it today. It just may take a little more time, since I just got it last night.      |
| BY THE COURT:                 | Well, no. I mean, you know, I'm not ready either, because I just got it this morning, too.                                                              |
| COUNSEL FOR PLAINTIFFS:       | Okay. Well, Judge, if we could maybe defer it to another date.                                                                                          |
| BY THE COURT:                 | I would like to do that, so that everybody knows and we don't have to take time to check and see all that today.                                        |
| COUNSEL FOR PLAINTIFFS:       | Okay.                                                                                                                                                   |
| COUNSEL FOR INTERVENOR:       | And, Judge, I have no problem with that. In fact, we contacted counsel yesterday to try to work that out, and there was no agreement that could be reached. |

United States Fire argues that the above exchange is simply another indication that Mr. Baltazar's counsel agreed to at least the $164,000.00 figure, and, as such, the basic amount was not in dispute. Thus, United States Fire argues, it was not required to provide evidence of all the payments made to Mr. Baltazar or on his behalf at the December 18, 2009 hearing.

At the December 18, 2009 hearing, both counsel for Mr. Baltazar and United States Fire argued their positions to the trial court concerning the intervention. During the hearing, Mr. Baltazar's counsel introduced various exhibits addressing the expenses his law firm incurred in pursuing Mr. Baltazar's claim, as well as his contingency fee contract. As previously stated, United States Fire introduced nothing in support of its claim at this hearing.

24

The facts before us present a most unusual case. It is abundantly clear from the record that United States Fire paid substantial workers' compensation benefits to, and on behalf of, Mr. Baltazar. What is not established by the evidence is the *amount* of those benefits. Regardless of the *information* contained in a record, we are bound to render judgment solely on the *evidence properly admitted*. We must agree with Mr. Baltazar that, based on the evidentiary record before us, United States Fire failed to establish by a preponderance of evidence the amount it paid to or on behalf of Mr. Baltazar. We find that the trial court erred in awarding any amount to the intervenor United States Fire. Accordingly, we reverse the trial court's judgment awarding United States Fire $98,000.00 as well as the award of attorney fees to Mr. Baltazar's counsel.

### *Assignment of Error Number Three*

Mr. Baltazar argues, in the alternative, that the trial court erred in its interpretation of La.R.S. 23:1103 in setting the amount of attorney fees awarded to him in the January 20, 2010 judgment. Because we reverse that judgment on other grounds, we do not address this issue.

### MOTION TO STRIKE ANSWER TO APPEAL

In their brief on appeal, the defendants assert that they filed an answer to Mr. Baltazar's appeal on December 14, 2009, wherein they sought a reversal of the jury's awards to Mr. Baltazar for mental pain and suffering, past medical expenses, and future medical expenses. Mr. Baltazar responded to this assertion by filing a motion to strike the answer to appeal. We grant Mr. Baltazar's motion as neither the trial court record nor the records of this court contain an answer to Mr. Baltazar's appeal.

25

Thus, we will not consider any issues addressed in the defendants' brief purportedly raised in the defendants' answer to appeal.

## DISPOSITION

For the foregoing reasons, we amend the trial court's October 19, 2009 judgment to award Mr. Baltazar $30,000.00 in past, present, and future physical pain and suffering and $50,127.96 for past lost wages and employment benefits. We affirm that October 19, 2009 judgment in all other respects. We reverse the trial court's January 20, 2010 judgment awarding United States Fire Insurance Company $98,000.00 and awarding Mr. Baltazar's attorney $49,000.00 for his attorney fees and costs. We render judgment denying United States Fire Insurance Company's claims on intervention. We grant Mr. Baltazar's motion to strike the defendants' answer to the appeal. We assign all costs of this appeal one-third to the plaintiff, Henry Adam Baltazar; one-third to the defendants, Dennis Wolinski, Kirkpatrick Industrial Supply, Inc., and Continental Casualty Company; and one-third to the intervenor, United States Fire Insurance Company.

**AMENDED IN PART, AFFIRMED IN PART, REVERSED IN PART, AND RENDERED**.